IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STEVEN BLEAU                          :
                                      :
            Plaintiff                 :        CIVIL ACTION
      v.                              :
                                      :        NO. 06-cv-2405
                                      :
DAVID DIGUGLIELMO, et al.             :
                                      :
            Defendants                :

---

**MEMORANDUM OPINION & ORDER**

GOLDEN, J.                                              MARCH 18, 2009

Before the Court is Defendants' Motion for Summary Judgment (Doc. No. 62) seeking

judgment as to all of *pro se* Plaintiff Steven Bleau's ("Bleau") claims in his Second Amended

Complaint.  Plaintiff alleges, pursuant to 42 U.S.C. § 1983, violations of his constitutional rights

under both the Due Process Clause of the Fourteenth Amendment and the Eighth Amendment's

prohibition of cruel and unusual punishment.  (Second Am. Compl. ¶¶ 30, 32).  Also before the

Court is Plaintiff's Cross-Motion for Partial Summary Judgment seeking judgment as a matter of

law only as to his Due Process claim.  (Doc. No. 65).[1]

On January 24, 2006, prison officials from the State Correctional Institution in Graterford,

Pennsylvania ("SCI-Graterford")—some of whom are named as Defendants in this matter—placed

Plaintiff in administrative custody pending an investigation into whether he was involved in the

---

[1] Plaintiff's Due Process claims have been asserted against the following Defendants in their individual and
official capacities: (1) David DiGuglielmo ("DiGuglielmo"), the Superintendent of the State Correctional Institution
at Graterford, Pennsylvania; (2) Michael A. Lorenzo ("Lorenzo"), Deputy Superintendent for Internal Security at
SCI-Graterford; (3) Intelligence Captain Thomas Dohman ("Dohman"); (4) Major Francis Field ("Field"); (5) Unit
Manager Jaime Luquis ("Luquis"); (6) Chief Hearing Examiner Robert S. Bitner ("Bitner"); (7) Hearing Examiner
Mary Canino ("Canino"); (8) Activities Manager Tony Wolfe ("Wolfe"); (9) Administrative Officer Levi Hosband
("Hosband"); and (10) Lieutenant J. Day ("Day").  (Second Am. Compl. ¶¶ 30, 31).  Plaintiff's Eighth Amendment
claims have been asserted against the following Defendants in their individual and official capacities: (1)
DiGuglielmo; (2) Lorenzo; and (3) Dohman.  (Id. ¶ 32).

drug culture at the prison.  Plaintiff was not informed of the reasons for his detention in

administrative custody until April 25, 2006.  The investigation by prison officials involved an

examination of various letters written by Plaintiff and, on May 31, 2006, culminated in the issuance

of several misconduct charges, some of which involved drug-related activity.  On June 6, 2006,

Plaintiff was found guilty of these misconduct charges and immediately placed in disciplinary

custody.  On July 24, 2006, Plaintiff was released from disciplinary custody status and transferred to

administrative custody status.  Plaintiff remained in administrative custody, with the exception of

time spent in the infirmary, until he was transferred to the State Correctional Institution at Fayette,

Pennsylvania ("SCI-Fayette") on September 26, 2006.  In total, Plaintiff spent 245 days in restrictive

detention: 181 days in administrative custody, sixteen days in the infirmary, and 48 days in

disciplinary custody.

Plaintiff's Due Process claims are essentially based on his contention that there was no

factual basis for prison officials to believe that he was part of the drug culture at SCI-Graterford.

Furthermore, Plaintiff argues that prison officials violated various prison regulations in both placing

Plaintiff in restrictive detention and prosecuting Plaintiff for misconduct.  Separately, Plaintiff's

Eighth Amendment claim alleges that several prison officials were deliberately indifferent to

Plaintiff's lockjaw condition.  For the reasons that follow, Defendants' Motion for Summary

Judgment is granted, and Plaintiff's Cross-Motion for Partial Summary Judgment is denied.[2]

_____

[2] On March 6, 2007, the Court dismissed without prejudice the following claims asserted by Plaintiff due to
Plaintiff's failure to exhaust available administrative remedies: (1) interference with the delivery of mail; (2)
indifference to Plaintiff's ongoing struggles with lockjaw and other oral health problems; (3) denial of a necessary
soft-food diet; (4) the placement of limitations on Plaintiff's access to the prison yard; (5) the placement of
limitations on Plaintiff's access to the prison law library; (6) retaliation against Plaintiff for filing civil rights actions;
(7) prevention of Plaintiff from working on his literary and musical projects; and (8) confiscation of Plaintiff's hard-
backed copy of the Koran.  (Doc. No. 31).  On May 11, 2007, the Court permitted Plaintiff to file a Second
Amended Complaint, "adding only the medical claim related to lockjaw for which [Plaintiff] has exhausted his
administrative remedies."  (Doc. No. 41).

## STANDARD

Summary judgment should be granted if the record, including pleadings, depositions, affidavits, and answers to interrogatories, demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In making that determination, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). It is not the role of the trial judge "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." Id. at 250. Indeed, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Id. at 255. Rather, the question is whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52. "At the summary judgment stage, in other words, 'all that is required [for the non-moving party to survive the motion] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve [at trial] the parties' differing versions of the truth." Jackson v. Univ. of Pittsburgh, 826 F.2d 230, 233 (3d Cir. 1987) (quoting First Nat'l Bank of Ariz. v. Cities Servs. Co., 391 U.S. 253, 288-89 (1968)), cert. denied, 484 U.S. 1020 (1988). As Plaintiff will bear the burden of proof at trial, Defendants may obtain summary judgment by affirmatively demonstrating that Plaintiff has either no evidence or insufficient evidence to meet his burden at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Further, as Plaintiff is not represented by counsel, the Court notes that "a *pro se* litigant's complaint must be construed liberally, and by extension, all reasonable latitude must be afforded in the summary judgment context." Woods v. Bentsen, 889 F. Supp. 179,

3

184 (E.D. Pa. 1995); see also Haines v. Kerner, 404 U.S. 519, 520 (1972).

**DUE PROCESS**

**I.      Facts Relating to Due Process Claim**

**A.      Placement in Administrative Custody**

In 2006, Plaintiff Steven Bleau was an inmate at SCI-Graterford serving a sentence of life

imprisonment.  (Bleau Dep. 4).  On January 24, 2006, Bleau was removed from SCI-Graterford's

general population and placed in administrative custody in the L-Block of the A-wing within the

Restricted Housing Unit ("RHU") of the prison pending an investigation by prison officials into

whether Plaintiff was contributing to the prison's drug culture.  (Id. at 10; Dohman Decl. ¶ 3; Defs.'

Stmt. of Facts ¶ A.2).[3]  On January 24, 2006, Plaintiff also received an "Other" report (#A770830)

authored by Defendant Intelligence Captain Thomas Dohman stating the following: "It has been

reported that you may be in violation of institutional rules or regulations.  You will remain in

administrative custody status pending an investigation."  (Defs.' Ex. 16).  Plaintiff was not informed

why he was under investigation.  (Defs.' Stmt. of Facts ¶ A.3).  On February 8, 2006—fifteen days

after Plaintiff's initial detention—Defendant Superintendent David DiGuglielmo approved a fifteen-

day extension of Plaintiff's placement in the RHU under administrative custody during the

pendency of the investigation.  (Defs.' Exs. 18, 21; Dohman Dec. ¶ 5; Defs.' Stmt. of Facts ¶ A.4).[4]

_____

[3] Plaintiff was placed in administrative custody pursuant to Procedure 802(VI)(A)(1)(f) of Pennsylvania's Department of Corrections' Policies and Procedures ("DC-ADM") because there was "a need for increased control pending . . . completion of the investigation."  (Defs.' Ex. 2; Dohman Decl. ¶ 3).  Under DC-ADM 802(VI)(A)(1)(f), "[a]ny general population inmate may be assigned AC [administrative custody] status and placed in a Security Level 5 Housing Unit by order of the Shift Commander . . . . [if] the inmate has been charged with, or is under investigation for a violation of facility rules and there is a need for increased control pending disposition of charges or completion of the investigation."  (Defs.' Ex. 2).

[4] Under DC-ADM 802(VI)(B)(4), while confinement in administrative custody for investigative purposes shall not exceed 15-calendar days, "[t]he Facility Manager may approve one 15-calendar day continuation of confinement, if the investigation has not been completed."  (Defs.' Ex. 2).

On February 24, 2006, Plaintiff received a second "Other" report (#A770870) by prison officials stating the following: "It has been determined that your involvement in illicit activities in the institution pose[s] a danger to the institution.  You will be placed in administrative custody for the safety of the institution pending possible charges and transfer."  (Defs.' Ex. 19; Pl.'s Ex. 3; Dohman Decl. ¶ 6).  This "Other" report also states that Plaintiff is "release[d] from investigation," but will "remain on A.C. [administrative custody] status" pursuant to DC-ADM 802 because Plaintiff is a "danger to the institution."  (Defs.' Ex. 19).[5]

On March 1, 2006, Plaintiff wrote to DiGuglielmo complaining about his allegedly arbitrary placement in the RHU.  (Defs.' Ex. 20; Pl.'s Ex. 4-1).  In particular, Plaintiff complained that he was not given a reason for his placement in administrative custody, which he argued constituted a violation of DC-ADM 802(VI)(B)(5).  (Defs.' Ex. 20; Pl.'s Ex. 4-1).[6]  Plaintiff also claimed that, after the fifteen-day administrative custody detention period ended on February 8, 2006, he had "never seen [a] PRC [Program Review Committee]" nor had he received "a 15 day continuance of investigation report from the Superintendent."  (Defs.' Ex. 20; Pl.'s Ex. 4-1).[7]  Plaintiff's complaint was treated as an appeal of both "Other" reports.  (Defs.' Ex. 21).  On March 6, 2006, DiGuglielmo sustained Plaintiff's placement in administrative custody.  (Id.).  Also on March 6, 2006, DiGuglielmo informed Plaintiff that a fifteen-day extension of administrative custody had been

---

[5] DC-ADM 802(VI)(A)(1) states that "[a]ny general population inmate may be placed in administrative custody if assigned AC [administrative custody] status and placed in a Security Level 5 Housing Unit by order of the Shift Commander" if, among other reasons, "the inmate is a danger to himself/herself or others" or "the inmate is suspected of being or is the instigator of a disturbance."  (Defs.' Ex. 2; DC-ADM 802(VI)(A)(1)(c), (d)).

[6] DC-ADM 802(VI)(B)(5) states the following: "An Administrative Hearing shall be conducted as follows...The rationale for AC [administrative custody] placement shall be read and explained to the inmate." (Defs.' Ex. 2).

[7] Under DC-ADM 802(VI)(B)(4), if a fifteen-day continuation is authorized by the Facility Manager, the "reason for the continuation shall be documented and a copy provided to the inmate."  (Defs.' Ex. 2).

granted on February 8, 2006 pursuant to Dohman's request.  (Id.; Defs.' Ex. 18; Pl.'s Ex. 4-2).[8]

**B.**   **Placement in Disciplinary Custody**

On approximately April 25, 2006, Dohman interviewed Plaintiff and informed Plaintiff, for the first time, that he had been placed in administrative custody because prison officials believed that Plaintiff was involved in the drug culture at SCI-Graterford.  (Bleau Decl. ¶ 7; Bleau Dep. 65-67; Dohman Decl. ¶ 11).  Dohman stated to Plaintiff that, based on confiscated letters, Plaintiff would be charged with various misconduct violations, some of which related to drugs.  (Bleau Dep. 65-67; Dohman Decl. ¶ 11).  Plaintiff denied (and continues to deny) any association with drugs, and argued (and continues to argue) that the confiscated letters concern Plaintiff's "poetry CD and book projects," not drugs.  (Second Am. Compl. ¶ 23; Pl.'s Stmt. of Facts ¶ A.13).  In the confiscated letters, Plaintiff wrote about an ongoing venture, profit from a prior project called a "hustle," and his need to make money.  (Defs.' Exs. 30 at 3, 5, 7).  Plaintiff wrote the following: "Make sure that you put it all in one *loon* as small as possible."  (Id. at 5 (emphasis added)).  He also wrote, "If you need me to pay you for the AOL, let me know.  I really need to make that money."  (Id. at 3).  Plaintiff's letters discuss a CD project, and one letter advises a cousin to contact Plaintiff by calling his counselor and claiming an important legal call.  (Id. at 10).  This letter also refers to paying other inmates who are working on Plaintiff's project.  (Id. at 11).

On May 31, 2006, Plaintiff was formally charged with several misconduct violations.  The

---

[8] On March 9, 2006, Plaintiff appealed DiGuglielmo's decision upholding the two "Other" reports.  (Defs.' Ex. 21; Pl.'s Ex. 4-3).  Plaintiff argued, among other things, that on February 24, 2006—following the completion of thirty days in administrative custody—he "was not seen by a PRC panel so they could determine if further A/C [administrative custody] placement was necessary."  (Defs.' Ex. 21; Pl.'s Ex. 4-3).  Plaintiff further averred that his retention in administrative custody in the RHU violated his due process rights.  (Defs.' Ex. 21; Pl.'s Ex. 4-3; Bleau Dep. 38-39).  On March 16, 2006, while Defendant Chief Hearing Examiner Robert S. Bitner was on vacation, Bitner's assistant conducted a final review of the record and upheld Plaintiff's placement in administrative custody, stating that "[Plaintiff's] placement in Administrative Custody was in complete accordance with the provisions outlined under DC-ADM 802."  (Defs.' Ex. 23; Pl.'s Ex. 4-4; Bitner Decl. ¶ 6).

charges were the following: (1) Possession or Use of a Dangerous or Controlled Substance; (2)

collectively, violations of 18 Pa. Cons. Stat. Ann. § 5123(a), (a.2), (c) (giving, transmitting, or

furnishing a controlled substance to a convict in prison), 35 Pa. Cons. Stat. Ann. § 780-101, *et seq.*

(Controlled Substance, Drug, Device and Cosmetic Act), and 18 Pa. Cons. Stat. Ann. § 903

(criminal conspiracy); (3) Possession of Contraband; (4) Unauthorized Use of the Mail or

Telephone; (5) Violation of Visiting Regulations; (6) Refusing to Obey an Order; and (7) Lying to

an Employee.  (Defs.' Ex. 29; Bleau Decl. ¶ 17).

On June 2, 2006, Defendant Hearing Examiner Mary Canino began Plaintiff's misconduct

hearing.  (Canino Decl. ¶ 4).  During the hearing, Plaintiff again denied any involvement in bringing

drugs into the prison, but admitted to making three-way phone calls in violation of prison rules.

(Bleau Dep. 122-23; Defs.' Ex. 31).  Accordingly, Plaintiff pled "guilty" to engaging in the

"Unauthorized Use of the Mail or Telephone," but pled "not guilty" to the remaining six charges.

(Defs.' Exs. 29, 31; Bleau Dep. 122-23).  On June 6, 2006, after examining the letters, Canino found

Plaintiff guilty of the six misconduct charges to which he had pled "not guilty."  (Defs.' Ex. 31).

Canino imposed a sanction of 360 days in disciplinary custody, with no credit for time already spent

in administrative custody.  (Defs.' Ex. 31; Pl.'s Ex. 15-1).  Plaintiff claims that he was never given

an opportunity to defend himself during the hearing.  (Bleau Decl. ¶ 22.e).  Plaintiff's disciplinary

custody punishment officially began on June 6, 2006, though he was not moved from the A-wing to

the B-wing within the L-block of the RHU until June 13, 2006.  (Defs.' Ex. 29; Banta Decl. ¶ 6).[9]

On June 6, 2006, Plaintiff appealed his conviction, which was affirmed on June 12, 2006.  (Defs.'

---

[9] The L-Block of the RHU contains four wings.  The L-Block's A-wing primarily houses inmates in administrative custody, and its B-wing primarily houses inmates in disciplinary custody.  (Bleau Dep. 91-92; Banta Decl. ¶ 14).  However, depending on the number of inmates assigned to the L-Block, administrative custody inmates may be assigned to the B-wing and disciplinary custody inmates may be assigned to the A-wing.  (Banta Decl. ¶ 15).  The sizes of the cells in the A-wing and the B-wing are the same.  (Id.).

Exs. 32-33).[10]

On June 13, 2006, Plaintiff filed an additional appeal. (Defs.' Ex. 34). On June 14, 2006, DiGuglielmo ruled that there were no procedural violations in the misconduct hearing. (Defs.' Ex. 35; Pl.'s Exs. 18-1, 33).[11] However, DiGuglielmo modified Canino's decision by crediting Plaintiff with time previously spent in administrative custody and reducing his sentence from 360 days to 210 days in disciplinary custody. (Defs.' Ex. 35; Pl.'s Exs. 18-1, 33; Bitner Decl. ¶ 7).

On June 19, 2006, Plaintiff filed his final appeal of his misconduct convictions. (Defs.' Ex. 36). On July 12, 2006, non-party Department of Corrections ("DOC") Secretary Jeffrey Beard, in consideration of Defendant Chief Hearing Examiner Bitner's recommendation, dismissed the findings of guilt on the following four charges: (1) Violation of Visiting Regulations; (2) Refusing to Obey an Order; (3) Lying to an Employee, and (4) Violation of 35 Pa. Cons. Stat. Ann. § 780-101, *et seq.* (Controlled Substance, Drug, Device and Cosmetic Act). (Defs.' Exs. 37-38; Pl.'s Ex. 18-2). Secretary Beard upheld the findings of guilt on the following four charges: (1) Possession or Use of a Dangerous or Controlled Substance; (2) collectively, violations of 18 Pa. Cons. Stat. Ann. § 5123(a), (a.2), (c) (giving, transmitting, or furnishing a controlled substance to a convict in prison), and 18 Pa. Cons. Stat. Ann. § 903 (criminal conspiracy); (3) Possession of Contraband; and (4) Unauthorized Use of the Mail or Telephone. (Defs.' Exs. 37-38; Pl.'s Exs. 18-2, 34; Bleau Dep. 147). As a result, Plaintiff's sentence to disciplinary custody was further reduced from 210 days to 180 days, with credit for the time he had already served in administrative custody. (Defs.' Exs. 37-

---

[10] See infra note 24.

[11] DiGuglielmo explained that, while Plaintiff was in administrative custody after February 24, 2006 for being a "danger to the institution" pursuant to DC-ADM 802(VI)(A)(1), Dohman "accumulated additional information which ultimately resulted in the misconduct [charges]." (Defs.' Ex. 35). Plaintiff argues that this is not accurate "because the sole evidence [prison officials] relied upon was four of plaintiff's letter[s], which [prison officials] had since 2005." (Pl.'s Br. at 23).

38; Pl.'s Exs. 18-2, 34). Thus, Plaintiff's sentence to disciplinary custody was set to conclude on

July 18, 2006. (Defs.' Ex. 37; Pl.'s Exs. 18-2, 34; Bitner Decl. ¶ 7).

On approximately July 24, 2006—six days after his disciplinary custody sentence was to

expire—Plaintiff's sentence was officially modified to 180 days and Plaintiff was transferred from

disciplinary custody status to administrative custody status, though he remained housed in the B-

wing within the L-block of the RHU. (Defs.' Exs. 38, 42; Banta Decl. ¶ 6).[12] Plaintiff did not file a

grievance complaining that he had been placed in disciplinary custody beyond the July 18, 2006

expiration date. (Bleau Decl. ¶ 23.f). Plaintiff stayed in the B-wing while in administrative custody

until August 2, 2006, at which time he was moved to the infirmary for dental treatment. (Banta

Decl. ¶ 14; Bleau Dep. 94-97; Defs.' Stmt. of Facts ¶ A.38). Plaintiff remained in the infirmary

until August 18, 2006. (Banta Decl. ¶ 13; Bleau Dep. 94-97). Upon his return to the RHU on

August 18, 2006, Plaintiff was placed in administrative custody within the L-Block's A-wing.

(Banta Decl. ¶ 14). On September 26, 2006, Plaintiff was transferred to SCI-Fayette. (Defs.' Ex.

46).

Plaintiff's total time on restricted status within the RHU at SCI-Graterford was 245

days—from January 24, 2006 until his transfer on September 26, 2006. Of the 245-day total,

Plaintiff spent sixteen days in the infirmary from August 2, 2006 to August 18, 2006. Of the

remaining 229 days, Plaintiff was housed in the L-Block of the RHU. He was in administrative

custody within the A-wing for the first 133 days (January 24, 2006 to June 6, 2006). He stayed in

the A-wing for an additional seven days while in disciplinary custody after his sentence began (June

6, 2006 to June 13, 2006). (Bleau Dep. 73; Banta Decl. ¶ 6). Plaintiff then moved to the B-wing,

---

[12] See supra note 9; infra note 13.

where he stayed for 41 days while in disciplinary custody (June 13, 2006 to July 24, 2006). (Defs.'
Ex. 69; Banta Decl. ¶ 6). Plaintiff was transferred to administrative custody status on July 24,
2006,[13] but remained in the B-wing for nine additional days (July 24, 2006 to August 2, 2006).
(Banta Decl. ¶¶ 6, 14). Plaintiff was then placed in the infirmary for approximately sixteen days
(August 2, 2006 to August 18, 2006). (Defs.' Ex. 74; Stanishefski Decl. ¶ 4; Bleau Decl. ¶ 15). On
August 18, 2006, Plaintiff was moved from the infirmary to administrative custody within the A-
wing of the L-Block—where he spent 39 days until his transfer to SCI-Fayette on September 26,
2006. (Defs.' Ex. 74; Banta Decl. ¶¶ 13-14). Accordingly, Plaintiff spent 181 days in
administrative custody (not including the sixteen-day infirmary stay) and 48 days in disciplinary
custody. (Defs.' Stmt. of Facts ¶ A.38).[14]

## II.   **Analysis**

Plaintiff's Due Process claim has been asserted against all ten Defendants[15] in this action.

---

[13] Plaintiff contends that he was actually removed from disciplinary custody on August 17, 2006, and that prison officials did not honor the reduced 180-day sentence. (Pl.'s Stmt. of Facts ¶ B.7; Pl.'s Ex. 18-3 (indicating August 31, 2006 transfer to administrative custody); Bleau Dep. 91; Bleau Decl. ¶ 23.f).

[14] Plaintiff attempts to manufacture material disputed facts by alleging that he was placed in administrative custody not because of drug-related activity (which he vigorously denies), but because of retaliation by prison officials for Plaintiff's literary and business ventures, as well as for Plaintiff's grievance regarding prison officials' alleged failure to give an IRS letter to Plaintiff that was sent by Plaintiff's family. (Pl.'s Stmt. of Facts ¶ A.1; Pl.'s Exs. 5-9; Pl.'s Br. at 19; Smith Decl. ¶ 2). Plaintiff bases these contentions on, among other things, his belief that Dohman was "infuriated while interrogating plaintiff about his legal entertainment company, and the IRS letter he received." (Pl.'s Stmt. of Facts ¶ A.12; Pl.'s Br. at 18-20, 26). Plaintiff's belief, however, is completely speculative, as he has produced no evidence in support of this retaliation argument. Plaintiff also claims, without any evidence, that Canino's verdict was biased and that she had predetermined her finding of Plaintiff's guilt. (Pl.'s Stmt. of Facts ¶ B.4; Pl.'s Br. at 23). As the Third Circuit has held, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." See Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990). Other facts that are disputed by Plaintiff are immaterial, including Plaintiff's contention that Defendants knew of his request for a phone call in late January 2006 after a member of Plaintiff's family passed away. (Pl.'s Stmt. of Facts ¶ A.2).

[15] The caption of the Second Amended Complaint lists two additional Defendants in this action: Business Manager Michael Spencer ("Spencer") and Mailroom Supervisor Kim Ulisny ("Ulisny"). In the original Complaint these Defendants were only sued for mail interference—a claim that was dismissed by the Court on March 6, 2007. (Doc. No. 31). Though these individuals are listed in the caption of the Second Amended Complaint, Spencer and Ulisny are not listed in the "Defendants" section of the Complaint. Thus, the Court concludes that Plaintiff is not

(Second Am. Compl. ¶¶ 30-31, 37).[16]  Plaintiff specifically contends that his Due Process rights were violated by Defendants' collective decision "to place and continue [Plaintiff's] placement in the segregated housing units (the hole) under Administrative Custody due to their unsubstantiated claim that plaintiff [had] violated D.O.C. [rules without] adhering to the Department of Corrections DC-ADM 802 Administrative Custody Policy."  (Id. ¶ 30).  Further, Plaintiff contends that the collective decision of Defendants to "issue Plaintiff a misconduct report with fabricated drug charges, convict, sentence to 360 days in the RHU, and sustain said conviction" violated his Due Process rights.  (Id. ¶ 31).  Defendants preliminarily argue that not all of Defendants were involved in the decision to place Plaintiff in administrative and disciplinary custody.  (Defs.' Br. at 37-39).  However, the Court need not assess the actual involvement of each Defendant for the purposes of determining liability.  Regardless of any involvement, none of the Defendants can be held liable for Due Process violations because Plaintiff did not have a constitutionally-protected liberty interest in remaining within the general population of SCI-Graterford.[17]

---

asserting his Due Process claim against Spencer and Ulisny.

[16] In addition to Defendants' Motion seeking summary judgment as to all of Plaintiff's claims, Plaintiff has submitted a Cross-Motion for Partial Summary Judgment only as to his Due Process claim.  "On cross-motions for summary judgment, the court construes facts and draws inferences in favor of the party against whom the motion under consideration is made."  Pichler v. UNITE, 542 F.3d 380, 386 (3d Cir. 2008) (internal quotations omitted) (petition for *certiorari* filed).  Accordingly, the Court will apply the summary judgment standard to each party's motion individually.  See Appelmans v. City of Philadelphia, 826 F.2d 214, 216 (3d Cir. 1987) ("This [summary judgment] standard does not change when the issue is presented in the context of cross-motions for summary judgment.").  If, upon review of cross motions for summary judgment, the Court finds no genuine dispute over material facts, then the Court "will order judgment to be entered in favor of the party deserving judgment in light of the law and undisputed facts."  Iberia Foods Corp. v. Romeo, 150 F.3d 298, 302 (3d Cir. 1998).

[17] Plaintiff also appears to be arguing in his opposition to Defendants' Motion for Summary Judgment that his constitutional rights were violated as a result of Defendants' alleged interference with the delivery of Plaintiff's mail and Defendants' alleged confiscation of Plaintiff's hard-backed copy of the Koran.  (Pl.'s Stmt. of Facts ¶¶ A.11, A.14).  These claims were initially dismissed by the Court because Plaintiff failed to exhaust his administrative remedies.  (Doc. No. 31).  Plaintiff apparently now claims that he did exhaust all his available remedies.  In particular, Plaintiff alleges that his final appeal with respect to each claim was intercepted by Dohman, thereby preventing complete adjudication.  (Pl.'s Stmt. of Facts ¶¶ A.11, A.14).  The Court can find no evidence in the record supporting the allegation that Dohman intercepted Plaintiff's appeals.  See Robertson, 914 F.2d at 382 n.12

Under the Fourteenth Amendment, no state shall deprive any person of liberty without due process of law.  U.S. Const. amend. XIV, § 1.  Thus, as a threshold matter, the Court must determine if Plaintiff had a constitutionally-protected liberty interest in avoiding either administrative or disciplinary custody.  A protected liberty interest in avoiding restrictive detention may arise from only (1) state law or (2) the Due Process Clause itself.  See Asquith v. Dep't of Corr., 186 F.3d 407, 409 (3d Cir. 1999).[18]

## A.       State-Created Liberty Interest

A state can create a constitutionally-protected liberty interest if the alleged deprivation or change in prison conditions "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  Sandin v. Conner, 515 U.S. 472, 484 (1995).  Prison conditions are "atypical and significant" when a sentenced inmate may not reasonably expect to encounter such a condition as a result of his or her conviction in accordance with due process of law.  Griffin v. Vaughn, 112 F.3d 703, 706 (3d Cir. 1997).  As a result, "the focus of this inquiry should not be on the language of a particular regulation, but rather on the nature of the deprivation."  Fraise v. Terhune, 283 F.3d 506, 522 (3d Cir. 2002).  In deciding whether a protected liberty interest exists, a court must engage in a fact-specific inquiry into "the duration of the . . . confinement and the conditions of that confinement in relation to other prison conditions."  Mitchell v. Horn, 318

_____

("[A]n inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment.").  Additionally, after these claims were dismissed by the Court, Plaintiff did not file a motion to amend his complaint to add these two claims in light of Dohman's alleged interception.  See Grayson v. Mayview State Hosp., 293 F.3d 103, 109 n.9 (3d Cir. 2002) ("For the sake of clarity, a prisoner plaintiff (or any other plaintiff) should not be able effectively to amend a complaint through any document short of an amended pleading.").  Accordingly, the Court will not address the merits of these claims.

[18] Defendants admit that Plaintiff exhausted his appeals as to (1) his placement in administrative custody while under investigation, (2) his placement in administrative custody prior to his disciplinary hearing, and (3) the misconduct findings and sanction.  (Defs.' Stmt. of Facts ¶ C.4).

F.3d 523, 532 (3d Cir. 2003).

The Court will first examine the conditions imposed on Plaintiff while he was in administrative and disciplinary custody within the RHU.  Pennsylvania DOC Policy states that administrative custody is "a status of confinement for non-disciplinary reasons, which provides closer supervision, control, and protection than is provided in general population."  (DC-ADM 801(IV)(A); Defs.' Ex. 1).  Disciplinary custody is the "maximum restrictive status of confinement to which an inmate guilty of a Class I misconduct may be committed."  (DC-ADM 801(IV)(H); Defs.' Ex. 1).  In the RHU, prisoners are subjected to 23-hour daily lockdown, while general population inmates experience 12.5-hour daily lockdown.  (Pl.'s Br. at 16).  While Plaintiff was in administrative custody within the L-Block of the RHU, he was permitted to request calls to people on his call list, sign-up and go to the law library, as well as receive non-contact visits from everyone on his visiting list.  (Banta Decl. ¶ 16; Bleau Dep. 70-71, 93, 101-02; DC-ADM 802(VI)(F)(1)(d); Defs.' Ex. 2).  Plaintiff could also request television and radio while in administrative custody, though he only did so once in late-August 2006.  (Bleau Dep. 89; Defs.' Ex. 44; Banta Decl. ¶¶ 16-17; Lorenzo Decl. ¶ 9; DC-ADM 802(VI)(F)(1)(b), (F)(3); Defs.' Ex. 2).  These activities were restricted while Plaintiff was in disciplinary custody.  (Banta Decl. ¶ 16).  For example, while in disciplinary custody, Plaintiff could have one non-contact family member visit once per month and he could only receive phone calls from his lawyer.  (Id.).  Disciplinary custody inmates are also not allowed television or radio privileges.  (Id.).  Plaintiff had no visits during July and August 2006 in which Plaintiff's status in either administrative or disciplinary custody would have mattered.  (Id. ¶ 17; Bleau Dep. 102).  Additionally, while in both administrative and disciplinary detention in the L-Block, Plaintiff received meals three times a day, showers every third day, and "yard" privileges for

at least one hour for five days a week, though Plaintiff was denied "yard" on several occasions. (Bleau Dep. 97, 104, 113; Defs.' Ex. 25; Pl.'s Br. at 16; Defs.' Br. at 30).  While in administrative and disciplinary custody, Plaintiff also received weekly visits from an imam, weekly or biweekly visits from his counselor, and monthly visits from a program management team which consisted of two officials, including a psychologist.  (Bleau Dep. 70, 104-05; Banta Decl. ¶ 18).

### 1.      Placement in Administrative Custody

Based on the conditions described above, Plaintiff's placement in administrative custody for 181 days (excluding the sixteen days in the infirmary) did not impose an atypical and significant hardship in relation to the ordinary incidents of prison life.  Plaintiff complains that the atypical and significant conditions imposed on him while he was in the RHU included, among other things, (1) having his mail screened by security before it was sent to the post office, (2) the increased level of security in the RHU as compared to the general population, (3) his denial of access to the law library and "yard" on a few occasions (Bleau Decl. ¶ 20), (4) restrictions on contact visits, and (5) the inability to attend work and educational programs.  (Pl.'s Br. at 16-17; Bleau Dep. 92-94).  These conditions, however, do not satisfy the Sandin standard, as it is not unusual for inmates in a number of circumstances to find themselves subjected to the conditions to which Plaintiff was also subjected while in administrative custody.  See Griffin, 112 F.3d at 708 (holding that "it is not extraordinary for inmates in a variety of circumstances to find themselves exposed to the conditions to which [plaintiff] was subjected [while in administrative custody in Pennsylvania prison]"); Allah v. Seiverling, 229 F.3d 220, 224 (3d Cir. 2000) ("[P]lacement in administrative confinement will generally not create a liberty interest.").

Moreover, Plaintiff's 181-day stay in administrative custody and 245-day total stay in the

14

RHU were not outside the norm, as it is not unusual for inmates to be subjected to conditions similar to those placed on administrative custody inmates "for a substantial period of time."  Griffin, 112 F.3d at 708.[19]  As the Third Circuit has held, "[g]iven the considerations that lead to transfers to administrative custody of inmates at risk from others, inmates at risk from themselves, and inmates deemed to be security risks, etc., one can conclude with confidence *that stays of many months are not uncommon*."  See id. (emphasis added).  For example, the Griffin Court determined that placement in administrative custody for a period as long as 15 months does not create an atypical and significant hardship.  Id.  Thus, Plaintiff's exposure to the conditions of administrative custody for 181 days (or approximately six months) did not deprive Plaintiff of a state-created liberty interest.  See Fraise, 283 F.3d at 522-23 (holding that indefinite placement in a harsh form of administrative detention "designed to isolate and rehabilitate gang members" and its accompanying restrictions did not impose an atypical and significant hardship); see also Torres v. Fauver, 292 F.3d 141, 151-52 (3d Cir. 2002) (placement in administrative custody for 120 days did not deprive plaintiff of a protected liberty interest); Jones v. Baker, 155 F.3d 810, 813 (6th Cir. 1998) (confinement in administrative custody for two and one-half years did not implicate a state-created liberty interest); Wilson v. Hogsten, 269 F. App'x 193, 195 (3d Cir. 2008) (placement in administrative detention "during the pendency of the ten-month internal investigation, and for ten weeks afterward, is not a cognizable constitutional claim"), cert. denied, 2009 WL 578702 (2009); Wilkins v. Bittenbender, No. 06-2827, 2007 WL 708993, at *2 (3d Cir. Mar. 7, 2007) (per curiam) (over ten months in administrative custody did not implicate a liberty interest); Riley v. Carroll, 200 F. App'x 157, 159 (3d Cir. 2006) (six months in administrative custody did not implicate a liberty

_____

[19] This result would not be different if Plaintiff's sixteen-stay in the infirmary was added to Plaintiff's 181-day stay in administrative custody, leading to a total stay of 197 days in administrative custody.

interest); but see Shoats v. Horn, 213 F.3d 140, 144 (3d Cir. 2000) (eight years in administrative custody implicated a liberty interest).[20]

## 2. Placement in Disciplinary Custody

Similarly, Plaintiff's 48-day placement in disciplinary custody (from June 6 to July 24, 2006) did not impose an atypical and significant hardship that would implicate a state-created liberty interest.  In Sandin, the U.S. Supreme Court held that the plaintiff prisoner's 30-day placement in disciplinary custody did not impose an "atypical and significant hardship" that would have created a liberty interest.  The Sandin Court reached this conclusion based on its findings that "disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody," and general population inmates experienced "significant amounts of 'lockdown time.'"  See Sandin, 515 U.S. at 486.  The Third Circuit has applied Sandin to hold that a period of confinement in disciplinary custody exceeding 48 days does not implicate a state-created liberty interest.  See Smith v. Mensinger, 293 F.3d 641, 654 (3d Cir. 2002) (holding that seven months in disciplinary custody "does not, on its own, violate a protected liberty interest"); Sims v. Vaughn, 189 F. App'x 139, 141 (3d Cir. 2006) (67-day placement in the RHU did not involve atypical or significant hardship); Davis v. United States, 182 F. App'x 105, 108 (3d Cir. 2006) (60 days in disciplinary custody did not constitute atypical or significant hardship); see also Mitchell, 318 F.3d at 532 (stating that the differences between administrative custody and disciplinary custody under the DC-ADM are "marginal" and do "not

---

[20] Plaintiff attempts to distinguish Sandin, which concluded that a 30-day period of disciplinary custody did not infringe upon a liberty interest, by arguing that the instant case, conversely, "deals with plaintiff being placed in the RHU under administrative custody, and receiving a misconduct five months later."  (Pl.'s Br. at 15).  The Third Circuit Court of Appeals, however, has applied Sandin to hold that, in general, no state-created liberty interest exists when a prisoner is placed in administrative custody.  See, e.g., Allah, 229 F.3d at 224.

appear to cross the constitutional line," though reversing district court's dismissal because the record needed to be more fully developed); Torres, 292 F.3d at 151-52 (placement in disciplinary custody for 15 days did not violate a protected liberty interest).  Plaintiff has presented no evidence indicating that the length or condition of his 48-day confinement in disciplinary custody was atypical or constituted a significant deprivation.[21]

### 3.    Effect of Prison Regulations

It is also worth noting that the existence of prison regulations does not create a liberty interest.  First, the DOC regulations themselves explain that any policy stated therein "does not create rights in any person."  (DC-ADM 802(VIII)).  Rather, these policies "should be interpreted to have sufficient flexibility to be consistent with law and to permit the accomplishment of the purpose of the policies of the Department [of Corrections]." (Id.); see also 37 Pa. Code § 93.11(a) ("An inmate does not have a right to be housed in a particular facility or in a particular area within a facility."); Nichelson v. Redwine, No. 99-1769, 2000 WL 1599246, at *2 (E.D. Pa. Oct. 26, 2000) ("Neither the Due Process Clause nor the laws of Pennsylvania give a convict a protected liberty interest in remaining in any particular housing status, in any particular state prison, or in any particular housing area within a state prison.").  Second, the mere existence of a regulation "conferring a right is not alone enough to trigger due process," but, rather, the plaintiff inmate must show the imposition of some atypical and significant hardship.  See Griffin, 112 F.3d at 708; see

---

[21] Even if the Court were to construe Plaintiff's stay in disciplinary custody as expiring on August 17, 2006 or August 31, 2006 (Pl.'s Stmt. of Facts ¶ B.7; Pl.'s Ex. 18-3; Defs.' Ex. 45)—leading to stays in disciplinary custody of 72 days and 86 days respectively (including the sixteen-day stay in the infirmary)—the duration of Plaintiff's stay in disciplinary custody would not violate a state-created liberty interest.  See Smith, 293 F.3d at 654 (seven months in disciplinary custody does not violate a protected liberty interest).

also Sandin, 515 U.S. at 484.[22]  Despite Plaintiff's repeated contention that prison regulations were

violated and thus his Due Process rights were infringed upon, the U.S. Supreme Court has rejected

the notion that (even where a state's statutes and regulations set forth mandatory procedures for

confining an inmate to restrictive detention) a state-created liberty interest exists in remaining in the

general prison population.  See Sandin, 515 U.S. at 481; see also Griffin, 112 F.3d at 709 n.3 ("The

mere fact that Pennsylvania has created a careful procedural structure to regulate the use of

administrative segregation does not indicate the existence of a protected liberty interest.  The

process afforded by state law is not relevant in determining whether there is a state created right that

triggers due process protection.").[23]  Courts have routinely held that the judiciary is "'ill equipped to

deal with the increasingly urgent problems of prison administration and reform' and should

_____

[22] Plaintiff also argues in his papers that DC-ADM 801—which states that "[a]ny attempt to commit any of the above listed charges shall constitute a misconduct of the same classification as the completed act"—is unconstitutional on the basis that it violates the "some evidence" rule announced in Superintendent v. Hill, 472 U.S. 445 (1985).  (Pl.'s Br. at 26); see Hill, 472 U.S. at 455-56 ("We hold that the requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board to revoke good time credits."); see also Turner v. Safley, 482 U.S. 78, 89 (1987) ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.").  As this claim is not in Plaintiff's Second Amended Complaint, nor has Plaintiff sought to amend his Complaint to include this claim, the Court will not consider it.  See Grayson, 293 F.3d at 109 n.9 (requiring amendment to be done through an amended pleading); see also Thompson v. Lehaman, No. 91-1501, 1992 WL 28052, at *3 (E.D. Pa. Feb. 12, 1992) ("DC-ADM 801 more than adequately requires that procedural due process be afforded to the inmates involved in disciplinary proceedings pursuant to its terms.  I therefore conclude that DC-ADM is not unconstitutional on its face.").

[23] Plaintiff cites Jones v. Coonce, 7 F.3d 1359, 1363 (8th Cir. 1993), and Lowrance v. Achtyl, 20 F.3d 529, 536 (2d Cir. 1994), for the proposition that a plaintiff is denied due process when he is placed in restrictive detention without being told the reason for the detention or given an opportunity to present a defense.  (Pl.'s Br. at 20-21).  These cases are inapposite as they were decided before Sandin.  Jones and Lowrance assessed whether due process was violated only after determining that state-created liberty interests were implicated by the respective state statutes at issue.  However, the U.S. Supreme Court's 1995 decision in Sandin set forth the "atypical and significant hardship" standard in establishing whether a state-created liberty interest exists.  The Sandin test effectively abandoned Hewitt's so-called "mandatory language" test on the ground that Hewitt improperly shifted "the focus of the liberty interest inquiry to one based on the language of a particular regulation, and not the nature of the deprivation."  Sandin, 515 U.S. at 481; see also Hewitt v. Helms, 459 U.S. 460, 471-72 (1983); Crowder v. True, 74 F.3d 812, 814 (7th Cir. 1996) ("In Sandin, the Court abandoned Hewitt's methodology for examining the interests allegedly created by the state.  It rejected 'mandatory language' as the focus in determining if a statute or regulation created a liberty interest.  Instead, the Court stated that it was returning to the due process principles established and applied in earlier cases which focused on the nature of the deprivation.").

18

therefore give significant deference to judgments made by prison officials in establishing,

interpreting, and applying prison regulations."  See Fraise, 283 F.3d at 515 (quoting Turner v.

Safley, 482 U.S. 78, 84-85 (1987)).  However, even if Defendant prison officials violated the

provisions of the DC-ADM (and the Court makes no decision on this point), the DC-ADM does not

provide rights congruent with those rights afforded by the Fourteenth Amendment's Due Process

Clause.  See Phillips v. Norris, 320 F.3d 844, 847 (8th Cir. 2003) ("[T]here is no federal

constitutional liberty interest in having state officers follow state law or prison officials follow

prison regulations."); Hovater v. Robinson, 1 F.3d 1063, 1068 n.4 (10th Cir. 1993) (stating that "a

failure to adhere to administrative regulations does not equate to a constitutional violation"); United

States v. Jiles, 658 F.2d 194, 200 (3d Cir. 1981) ("The simple fact that state law prescribes certain

procedures does not mean that the procedures thereby acquire a federal constitutional dimension.")

(quoting Slotnick v. Staviskey, 560 F.2d 31, 34 (1st Cir. 1977)), cert. denied, 455 U.S. 923 (1982).[24]

---

[24] On June 6, 2006, Plaintiff appealed his misconduct convictions claiming (as he does in the case *sub judice*) that the May 31, 2006 misconduct charges were untimely under DC-ADM 802(VI)(B)(4) because they were filed well over 30 days after the investigation was completed while Plaintiff was in administrative custody. (Defs.' Ex. 32; Pl.'s Br. at 23).  Under DC-ADM 802(VI)(B)(4), "[f]ollowing the 30-calendar day period, if the inmate remains in AC [administrative custody] status, he/she must be charged with a misconduct and a hearing held within seven workdays, excluding weekends and State holidays." (Defs.' Ex. 2).  According to Plaintiff's untimeliness argument—which was also made in an effort to overturn his two "Other" reports—the Department of Corrections therefore had seven workdays following Plaintiff's completion of thirty days in administrative custody to charge Plaintiff with misconduct. (Defs.' Ex. 32; Pl.'s Br. at 23).  Thus, according to Plaintiff, since Plaintiff was placed in administrative custody on January 24, 2006 (and thirty calendar days later was February 23, 2006), the Department of Corrections had until approximately March 6, 2006 to issue misconduct charges, but only did so on May 31, 2006. (Defs.' Ex. 32).  Plaintiff further averred in his June 6, 2006 appeal that Canino did not give him credit for time already spent in administrative custody, and that her findings of fact regarding the misconduct charges were "baseless" and not supported by the evidence.  (Id.).  Defendants contend, however, that the procedures set forth in DC-ADM 801, not DC-ADM 802, apply to misconduct hearings. (Canino Decl. ¶ 8).  According to Defendants, the procedures in DC-ADM 801 "do not address . . . dismissal based on an alleged violation of other DOC procedures"—including DC-ADM 802—and have no statute of limitations.  (Id.).  In her declaration, Canino explained that DC-ADM 802(VI)(B)(4) "does not preclude a misconduct hearing under DC-ADM 801," but instead "calls for a hearing . . . to determine if further AC (administrative custody) placement is necessary." (Id. ¶ 9).  The Court will give deference to judgments made by prison officials in interpreting prison regulations.  See Fraise, 283 F.3d at 515.

**B.**     <u>Due Process-Created Liberty Interest</u>

As to whether the Due Process Clause created a liberty interest in Plaintiff not being placed in restrictive detention, it is clear—as the Court acknowledged in its March 6, 2007 Order (Doc. No. 31)—that no such liberty interest was created.  The U.S. Supreme Court has stated that "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight."  <u>See</u> <u>Hewitt v. Helms</u>, 459 U.S. 460, 468 (1983) (internal citations omitted), <u>overruled on other grounds by</u> <u>Sandin</u>, 515 U.S. 472; <u>see also</u> <u>Fraise</u>, 283 F.3d at 522.  Put another way, "where there is no state-created liberty interest, the Due Process Clause applies only if the restraints at issue exceed the prisoner's sentence 'in such an unexpected manner as to give rise to protection by the Due Process Clause of [their] own force' and do not violate any other constitutional provision."  <u>Torres</u>, 292 F.3d at 150 (quoting <u>Sandin</u>, 515 U.S. at 484).

The U.S. Supreme Court has held that a plaintiff prisoner's transfer to "less amenable and more restrictive quarters," such as administrative custody, does not implicate a liberty interest protected by the Due Process Clause because "administrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration."  <u>See</u> <u>Hewitt</u>, 459 U.S. at 468; <u>see also</u> <u>Williams v. Campbell</u>, No. 07-885, 2008 WL 2816089, at *9 (E.D. Pa. July 18, 2008).  A prisoner similarly does not have a liberty interest found in the Due Process Clause to be free from disciplinary custody.  <u>See</u> <u>Torres</u>, 292 F.3d at 150 (holding that plaintiff prisoner had no Due Process liberty interest to remain free from detention in both administrative and disciplinary custody).  Thus, the Constitution does not guarantee that a convicted prisoner will be

20

placed in any particular prison or remain in a preferred facility within a state's prison system.  See

Meachum v. Fano, 427 U.S. 215, 224 (1976); Asquith, 186 F.3d at 410.  Here, Plaintiff's

commitment to both administrative custody for 181 days and disciplinary custody for 48 days

neither exceeded Plaintiff's sentence of life imprisonment nor violated the Constitution.  (Bleau

Dep. 4).[25]  Accordingly, Defendants did not infringe upon any liberty interest created by the

Constitution.  See Fraise, 283 F.3d at 522 (holding that an indefinite transfer to administrative

custody did not implicate a liberty interest created by the Constitution).[26]

---

[25] Even if Plaintiff had a constitutionally-protected liberty interest in remaining in the general population of SCI-Graterford, it cannot be said that prison officials denied Plaintiff due process by interpreting Plaintiff's letters as involving drug-related activity.  "So long as *some evidence* in the record supports the factfinder's decision, the factfinder's resolution of factual disputes, including credibility disputes between witnesses, is binding and final."  Mullins v. Smith, 14 F. Supp. 2d 1009, 1012 (E.D. Mich. 1998) (emphasis added); see also Hill, 472 U.S. at 455-56; Thompson v. Owens, 889 F.2d 500, 502 (3d Cir. 1989) (noting that "[t]he due process requirements in this context are minimal").  "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence."  Hill, 472 U.S. at 455.

In the letters, Plaintiff wrote about, among other things, a "hustle" and his need to make money.  (Defs.' Ex. 30 at 3, 7).  He also asked one recipient to "[m]ake sure that [he] put it all in one *loon* as small as possible."  (Id. at 5 (emphasis added)).  Plaintiff argues that these phrases—particularly "loon" and "hustle"—concern wrapped CDs and a music project venture.  (Bleau Dep. 131-32).  However, these terms could reasonably be construed as being drug-related.  It is not uncommon for the term "hustle" to mean an "attempt to obtain drug customers" and for the term "loon" to mean a balloon used to supply heroin.  See Indiana Prevention Resource Center Drug Slang Dictionary, Indiana University, http://www.drugs.indiana.edu/drug-slang.aspx (last visited Mar. 17, 2009); Office of National Drug Control Policy, Street Terms, http://www.whitehousedrugpolicy.gov/streetterms (last visited Mar. 17, 2009).  Accordingly, even if Plaintiff had been entitled to due process of law, the conclusion of Canino and other prison officials that these letters concern drug-related activity was certainly supported by "some evidence."  See Mullins, 14 F. Supp. 2d at 1012 (holding that the hearing officer's finding that the plaintiff prisoner had attempted to smuggle drugs inside the prison was supported by some evidence—particularly a package sent to an attorney's office, with the plaintiff's return address, containing marijuana inside a hallowed-out copy of the plaintiff's trial transcript, along with a cover letter purportedly from the attorney's office addressed to the plaintiff indicating that the transcript had been checked for errors and was being returned to the plaintiff as legal mail).  Despite Plaintiff's contentions, the prison officials involved in the decision to place Plaintiff in the RHU were "not required to find plaintiff guilty beyond a reasonable doubt, or find that plaintiff's guilt was the only reasonable interpretation of the evidence."  See id.  This Court cannot (and will not) "relitigate de novo the determinations made in prison disciplinary hearings."  See id.

[26] On March 6, 2007, the Court dismissed Plaintiff's initial claim that Plaintiff had been unlawfully retaliated against for filing civil rights actions on the ground that Plaintiff had failed to exhaust his administrative remedies.  (Doc. No. 31).  Plaintiff now asserts a similar retaliation claim in his Opposition to Defendants' Motion for Summary Judgment.  (Pl.'s Br. at 18-20, 26).  Plaintiff claims that he was placed in administrative custody on January 24, 2006 and ultimately prosecuted by prison officials not because of any drug activity, but because of his literary and business endeavors, and his grievance regarding prison officials' alleged failure to give Plaintiff an IRS letter that was sent by Plaintiff's family.  (Pl.'s Stmt. of Facts ¶¶ A.1, A.12; Pl.'s Exs. 5-9; Pl.'s Br. at 19; Smith

## EIGHTH AMENDMENT

**I.**     **Facts Relating to Eighth Amendment Claim**

On February 28, 2006, Plaintiff went to the oral surgery clinic at SCI-Graterford where non-party dentist Dr. Martin Zarkoski extracted Plaintiff's upper left wisdom tooth due to decay.  (Defs.' Ex. 52; Bleau Dep. 27-30, 32; Pl.'s Stmt. of Facts ¶ C.1).  A few days after the tooth extraction—on or about March 3, 2006—Plaintiff began experiencing lockjaw.  (Defs.' Exs. 61, 68; Bleau Dep. 32; Bleau Decl. ¶ 10).  On March 7, 2006, Plaintiff went to the dental clinic.  (Defs.' Exs. 52, 54).  The

---

Decl. ¶ 2).  Plaintiff specifically contends that his literary endeavors were constitutionally protected by the First Amendment.  (Pl.'s Br. at 17).  Plaintiff also states that the misconduct charges issued against him on May 31, 2006 were in retaliation for his filing of both a mail grievance and this Section 1983 action.  (Pl.'s Stmt. of Facts ¶ B.1).  This retaliation claim, however, is not in Plaintiff's Second Amended Complaint.  See Grayson, 293 F.3d at 109 n.9 (requiring amendment to be done through an amended pleading).

Even if the Court were to conclude that exhaustion was satisfied and permit amendment to include this retaliation claim, such a claim would fail.  "Retaliation may be actionable . . . even when the retaliatory action does not involve a liberty interest."  Allah, 229 F.3d at 224; see also Smith, 293 F.3d at 654 ("Prison disciplinary proceedings may, however, constitute a denial of due process in the context of a civil rights action under § 1983 when they are instituted for the sole purpose of retaliating against an inmate for his/her exercise of a constitutional right.").  To establish a retaliation claim, Plaintiff must show: (1) that he engaged in constitutionally protected conduct; (2) an adverse action by prison officials sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) a causal link between the exercise of his constitutional rights and the adverse action taken against him.  See Mitchell, 318 F.3d at 530.  "Even if a causal link is satisfied, a defendant can still prevail if he shows that the same action would have been taken in the absence of the protected activity."  Sims, 189 F. App'x at 141 (citing Rauser v. Horn, 241 F.3d 330, 333-34 (3d Cir. 2001)).

Even if Plaintiff engaged in constitutionally-protected conduct (to which the Court renders no decision), Plaintiff has produced no evidence establishing a causal link between his alleged protected conduct and the adverse action taken against him—namely, his placement in the RHU and his subsequent prosecution for misconduct.  Any causal relationship is pure conjecture.  See Robertson, 914 F.2d at 382 n.12 ("[A]n inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment.").  Moreover, even if Plaintiff could somehow establish the elements above, the record demonstrates that Canino and the other Defendants would have taken the same action in placing Plaintiff in restrictive detention, imposing charges, and issuing a sanction of disciplinary custody.  Again, based on the letters written by Plaintiff, there was "some evidence" supporting Defendants' belief that Plaintiff was involved in the drug culture at SCI-Graterford.  See supra note 25; see also Hill, 472 U.S. at 455-56 (holding that, in the setting of a prison disciplinary proceeding, due process requires that there be "some evidence" to support the findings made in the disciplinary hearing).  As a result, Defendants' actions would have been undertaken notwithstanding Plaintiff's literary or other business activities.  See Sims, 189 F. App'x at 141 (dismissing plaintiff's appeal of district court's rejection of plaintiff's retaliation claim on the basis that the hearing officer would have made the same decision even if plaintiff could establish a causal link).  As "[i]t is not the prerogative of the Court to second guess prison officials' interpretations of security issues," the Court will not do so here.  See O'Connell v. Sobina, No. 06-238, 2008 WL 144199, at *15 (W.D. Pa. Jan. 11, 2008); see also Rhodes v. Chapman, 452 U.S. 337, 349 n.14 (1981) ("[A] prison's internal security is peculiarly a matter normally left to the discretion of prison administrators.").

examining dentist noted a "possible dry socket" at the tooth extraction site, and subsequently

prescribed antibiotic and pain medication.  (Bleau Dep. 35-36; Defs.' Exs. 52, 54).  On March 13,

2006, Plaintiff received another dental examination.  (Defs.' Ex. 54; Pl.'s Stmt. of Facts ¶ C.2).

During this examination, Dr. Zarkoski ordered that Plaintiff consume a soft-food diet until April 1,

2006.  (Defs.' Ex. 54; Pl.'s Stmt. of Facts ¶ C.2).  He also ordered that Plaintiff receive a

consultation with an oral surgeon.  (Bleau Dep. 39-40, 57; Defs.' Exs. 52, 54).

On March 16, 2006, Plaintiff received an oral surgeon consultation with non-party Dr.

Daniel Lucyk, who periodically performed examinations at SCI-Graterford.  (Defs.' Exs. 52, 54).

The next day, Plaintiff went to the dental clinic for a follow-up visit with Dr. Zarkoski, who

prescribed additional pain medication.  (Defs.' Ex. 56).  Plaintiff saw Dr. Zarkoski at the dental

clinic again on March 23, 2006, during which time Plaintiff was prescribed more medication.

(Defs.' Exs. 56-57; Bleau Dep. 47-48).  On March 24, 2006, Plaintiff was taken to Episcopal

Hospital for an appointment due to his oral health problems, but he was not treated because prison

officials transported Plaintiff to the hospital after the appointment's scheduled time.  (Pl.'s Stmt. of

Facts. ¶ C.3; Defs.' Reply at 7 ¶¶ C.2-3).  Plaintiff was returned to the RHU in administrative

custody, and his treatment was rescheduled for April 3, 2006.  (Defs.' Ex. 56).

On March 29, 2006, Plaintiff wrote to DiGuglielmo in an "Inmate Request to a Staff

Member" form complaining that he had only received four soft-food trays despite Dr. Zarkoski's

March 13 order.  (Defs.' Ex. 59).  On March 30, 2006, Plaintiff wrote to Dohman in another

"Inmate Request to a Staff Member" form expressing similar concerns.  (Defs.' Ex. 60).  Plaintiff

also asked Dohman to release Plaintiff from administrative custody in the RHU or, in the

alternative, to set up an expedited transfer of Plaintiff to the general population of another prison.

(Id.).  Plaintiff once again stated in the letter that he had only received four soft-food trays since

being prescribed a soft-food diet on March 13, 2006, and he complained that he was "literally

starving down" in the RHU.  (Id.; Pl.'s Stmt. of Facts ¶ C.2; Bleau Decl. ¶ 11; Moore Decl. ¶¶ 4, 5).

On April 1, 2006, Dr. Zarkoski's order that Plaintiff be placed on a soft-food diet expired.  (Defs.'

Exs. 54, 62).  Plaintiff argues before the Court, as he did in his grievances, that he only received

four soft-food trays between March 13, 2006—the date of Dr. Zarkoski's soft-food diet order—and

April 1, 2006—the date the soft-food diet order expired.  (Second Am. Compl. ¶ 32.c; Bleau Decl. ¶

11).

      On April 3, 2006, Plaintiff was taken off site to Episcopal Hospital for treatment regarding

complications from his tooth extraction, including Plaintiff's lockjaw condition.  (Defs.' Ex. 56).

At Episcopal Hospital, a surgical procedure was performed which forced Plaintiff's mouth open.

(Bleau Dep. 49-50).  The physician treating Plaintiff also recommended post-surgery therapy to

prevent the recurrence of lockjaw.  (Pl.'s Stmt. of Facts ¶ C.5).  Plaintiff returned to administrative

custody that same day.  (Defs.' Ex. 56).  According to Plaintiff, his jaw remained closed from

February 28, 2006 to the date of his surgery on April 3, 2006.  (Pl.'s Stmt. of Facts ¶ C.4; Bleau

Decl. ¶ 10).

      Also on April 3, 2006—two days after the soft-food diet order expired—Plaintiff submitted

an "Official Inmate Grievance" form to non-party Facility Grievance Coordinator Wendy Moyer

claiming the following:

> Soft meals have been ordered for me over three weeks ago [on March 13, 2006] by the
> dental department.  To date, I have literally received four . . . soft [food] trays.  When
> I did get them it was only for one meal out of the day.  I have not been able to open my
> mouth to eat solid food since March 3[rd] due to an improper dental procedure [tooth
> extraction on February 28, 2006] that resulted in lockjaw.  Since I am on A/C
> [administrative custody] status in the RHU, I cannot make my own meals and must rely
> on the trays to get the proper daily nutrition.  I don't know if the main kitchen isn't

sending the trays, or they are and the officers here in the RHU aren't giving them to me.
I do know I am going to bed hungry and waking up hungry [throughout] most of the
day, since the trays were ordered [on March 13, 2006].

(Defs.' Ex. 61; Pl.'s Ex. 21-1).

On April 18, 2006, non-party Grievance Officer Jeraldine Marable responded to the grievance, and

informed Plaintiff that the soft-food diet order was on file, but that the grievance had been resolved

because Dr. Zarkoski's soft-food diet order had expired on April 1, 2006.  (Defs.' Ex. 62; Pl.'s Ex.

21-2).

On April 6, 2006, Dr. Zarkoski again examined Plaintiff in the dental clinic.  (Bleau Dep.

61).  Dr. Zarkoski did not extend his March 13, 2006 soft-food diet order, nor is there any notation

by Dr. Zarkoski in his medical report indicating that Plaintiff asked for an extension of this order.

(Defs.' Ex. 56).  On April 16, 2006, Plaintiff was again treated by Dr. Zarkoski, and Dr. Zarkoski

noted in his report that Plaintiff's "range of motion is greatly improved and pain almost gone."  (Id.;

Bleau Dep. 62).

On June 14, 2006, after Plaintiff's lockjaw condition recurred, an attempt was made by an

oral surgeon to open Plaintiff's mouth in a medical procedure.  (Defs.' Exs. 65-66, 68; Pl.'s Exs. 20-

3, 24-1; Bleau Dep. 81).  After opening Plaintiff's mouth one-quarter inch, the procedure was

suspended due to pain.  (Defs.' Ex. 68; Pl.'s Ex. 24-1).  The oral surgeon also recommended that

Plaintiff receive additional therapy with Dr. Zarkoski.  (Defs.' Ex. 68; Pl.'s Ex. 24-1).  On July 3,

2006, Plaintiff filed another grievance with Grievance Coordinator Wendy Moyer claiming that he

had not received any dental therapy after his June 14, 2006 appointment with the oral surgeon and

complaining that his conditions in the RHU had not been relaxed as a result of his medical

condition.  (Defs.' Ex. 68; Pl.'s Ex. 24-1).  On July 10, 2006, non-party Health Care Administrator

Myron Stanishefski ("Stanishefski") denied the grievance and informed Plaintiff that he would be

seen by Dr. Lucyk on July 13, 2006.  (Defs.' Ex. 69; Pl.'s Ex. 24-2).  This July 13, 2006

appointment did not occur, (Defs.' Exs. 49, 66, 69; Pl.'s Ex. 24-2), though Dr. Zarkoski

recommended to Dr. Lucyk on July 12, 2006 that Plaintiff be treated by an off-site oral surgeon.

(Defs.' Ex. 66; Pl.'s Exs. 20-3, 24-2).  On July 14, 2006, Plaintiff filed an appeal of Stanishefski's

grievance denial.  (Defs.' Ex. 69; Pl.'s Ex. 24-2).  On July 26, 2006, Plaintiff was taken to an oral

surgeon at Episcopal Hospital, where the surgeon again attempted to open Plaintiff's mouth, but was

unable to do so.  (Defs.' Ex. 71; Pl.'s Ex. 23).  The surgeon recommended therapy twice a day and a

follow-up appointment within thirty days.  (Pl.'s Exs. 4-3, 23, 24-2).  On August 2, 2006,

DiGuglielmo remanded Plaintiff's grievance appeal back to Stanishefski to investigate Plaintiff's

need for follow-up evaluation and treatment.  (Defs.' Ex. 69; Pl.'s Ex. 24-2).  On August 4, 2006,

Stanishefski informed Plaintiff that his grievance had been resolved based on his July 26, 2006

treatment.  (Pl.'s Ex. 24-2).[27]

On August 2, 2006, Plaintiff was transferred from disciplinary custody in the L-Block to the

infirmary for his requested dental therapy.  (Stanishefski Decl. ¶ 4; Bleau Dep. 94).  Plaintiff ate a

normal diet during his stay in the infirmary.  (Defs.' Exs. 71-73; Bleau Dep. 95).  He also saw a

dentist and nurse daily for therapy and received dental exercises.  (Bleau Dep. 95-97; Stanishefski

Decl. ¶ 5; Defs.' Exs. 74-75).  On August 18, 2006, Plaintiff was transferred after sixteen days in the

infirmary, where he received a bite block and was instructed how to conduct the dental therapy by

---

[27] On August 28, 2006, Plaintiff filed an appeal of Stanishefski's grievance decision, claiming that Plaintiff
had not received a follow-up appointment with an oral surgeon thirty days after his July 26, 2006 appointment.  (Pl.'s
Ex. 24-3).  In his appeal, Plaintiff stated that his "jaw still does not open to its normal length."  (Id.).  On September
26, 2006, Plaintiff was transferred to SCI-Fayette.  (Defs.' Ex. 46).  On November 29, 2006, while Plaintiff was at
SCI-Fayette, Plaintiff's appeal was denied because "treatment was rendered and continued after [Plaintiff] was
transferred to SCI-Fayette" and "[i]t has been reported that [Plaintiff's] range of jaw motion has returned to normal."
(Pl.'s Ex. 24-3).

himself.  (Defs.' Ex. 74).  In total, Plaintiff received at least eighteen dental visits with a dentist or

oral surgeon for his lockjaw condition.  (Defs.' Exs. 50-58, 72-75; Defs.' Br. at 29, 44).

**II.**     <u>**Analysis**</u>

Plaintiff asserts Eighth Amendment violations by Defendants Superintendent David

DiGuglielmo, Intelligence Captain Thomas Dohman, and Deputy Superintendent for Internal

Security Michael Lorenzo.  (Second Am. Compl. ¶¶ 32, 35-36).[28]  The Eighth Amendment

guarantees that individuals will not be subjected to "cruel and unusual punishment."  U.S. Const.

amend. VIII.  "[T]he Eighth Amendment's prohibition against cruel and unusual punishment

requires prison officials to provide basic medical treatment to those whom it has incarcerated."

<u>Rouse v. Plantier</u>, 182 F.3d 192, 197 (3d Cir. 1999) (citing <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976)).

To establish an Eighth Amendment claim "a prisoner must allege acts or omissions sufficiently

harmful to evidence deliberate indifference to serious medical needs."  <u>Id.</u> (quoting <u>Estelle</u>, 429 U.S.

at 106).  Thus, to succeed under these principles, a plaintiff must (1) make a "subjective" showing

---

[28] Defendants first contend that the only appropriate defendants to this claim are DiGuglielmo and Dohman because they are the only defendants who had knowledge of Plaintiff's oral health condition.  (Defs.' Br. at 41-42). "A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*."  <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1207 (3d Cir. 1988).  As a result, because Defendants in this action are not medical personnel, they cannot be held liable unless they each had a reason to believe (or possessed actual knowledge) that prison doctors were mistreating Plaintiff.  <u>See</u> <u>Spruill v. Gillis</u>, 372 F.3d 218, 236 (3d Cir. 2004).  Plaintiff has presented evidence showing that DiGuglielmo and Dohman had knowledge of Plaintiff's oral health complaints.  For example, on March 29, 2006, Plaintiff wrote to DiGuglielmo complaining that Plaintiff could not get food in his mouth due to his lockjaw condition.  (Defs.' Ex. 59).  Further, on March 30, 2006, Plaintiff wrote to Dohman expressing his discomfort.  (Defs.' Ex. 60).  Whether Lorenzo had the requisite knowledge is less clear, as there is little documentary evidence of such knowledge in the record.  During Plaintiff's deposition, Plaintiff stated that he "remember[s] writing to Lorenzo" about his condition. (Bleau Dep. 55, 183).  Based on this assertion, the Court will infer in favor of Plaintiff and conclude that Lorenzo had knowledge of Plaintiff's medical condition.  Summary judgment is granted as to the remaining Defendants to the extent that the Second Amended Complaint asserts an Eighth Amendment claim against them.  Though Plaintiff stated at deposition that he may have complained to a unit manager about his lockjaw medical condition, he was uncertain.  (<u>Id.</u> at 55).  The only unit manager listed as a defendant in this action is Jamie Luquis, but Plaintiff's Second Amended Complaint does not make any claims of "deliberate indifference" against Luquis.  Rather, Luquis is sued for violating Plaintiff's Due Process rights.  (Second Am. Compl. ¶ 30).  Accordingly, the question that remains is whether summary judgment is appropriate as to Plaintiff's Eighth Amendment oral health claim against DiGuglielmo, Lorenzo, and Dohman.

that the defendants acted with a sufficiently culpable state of mind and (2) make an "objective"

showing that the deprivation was "sufficiently serious."  See id.; Thomas v. Dragovich, 142 F.

App'x 33, 36 (3d Cir. 2005).  Defendants do not appear to argue that Plaintiff's medical needs

relating to his lockjaw condition were non-serious.[29]  Therefore, the dispute between the parties

centers on whether Defendants acted with a sufficiently culpable state of mind to establish

"deliberate indifference."  Although prisons have a duty to provide adequate medical care, "[i]t is

well-settled that claims of negligence or medical malpractice, without some more culpable state of

mind, do not constitute 'deliberate indifference'"  Rouse, 182 F.3d at 197; see also Estelle, 429 U.S.

at 105-06.  Instead, "deliberate indifference" requires "'obduracy and wantonness,' which has been

likened to conduct that includes recklessness or a conscious disregard of a serious risk."  Rouse, 182

F.3d at 197 (citing Whitley v. Albers, 475 U.S. 312, 219 (1986), and Farmer v. Brennan, 511 U.S.

825, 842 (1994)); Brooks v. Celeste, 39 F.3d 125, 127-28 (6th Cir. 1994).

   The Third Circuit Court of Appeals has found "deliberate indifference" in a number of

circumstances, including "where the prison official (1) knows of a prisoner's need for medical

treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a

non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical

treatment."  Rouse, 182 F.3d at 197; see also Drippe v. Gototweski, No. 06-1096, 2008 WL

3347817, at *3 (E.D. Pa. Aug. 11, 2008).  However, where a prisoner is under the care of a medical

expert, a non-medical prison official can only be held to be deliberately indifferent to a medical

condition if that non-medical prison official has "a reason to believe (or actual knowledge) that

---

[29] A  medical need is serious if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."  Monmouth County Corr. Institutional Inmates v. Lazaro, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotations omitted), cert. denied, 486 U.S. 1006 (1988).

prison doctors or their assistants are mistreating (or not treating)" the prisoner.  Spruill v. Gillis, 372

F.3d 218, 236 (3d Cir. 2004).  "This follows naturally from the division of labor within a prison."

Id.  "If a prisoner is under the care of medical experts . . ., a non-medical prison official will

generally be justified in believing that the prisoner is in capable hands."  Id.  In order to charge a

non-medical prison official with the Eighth Amendment scienter requirement of "deliberate

indifference," a plaintiff "bears the burden of proving . . . facts supporting the defendants' mental

states."  Id.  More specifically, the failure of a corrections officer to take further action once the

officer has (a) reviewed the prisoner's medical complaints, (b) verified that the prisoner is receiving

treatment, and (c) referred those complaints to medical providers, does not constitute deliberate

indifference because medical providers could have been expected to address prisoner's concerns.

See Greeno v. Daly, 414 F.3d 645, 655-56 (7th Cir. 2005).

     Plaintiff claims that DiGuglielmo, Lorenzo, and Dohman exhibited deliberate indifference

by: (1) failing to expedite the transfer of Plaintiff to an outside facility for emergency treatment of

his lockjaw condition from approximately March 3, 2006 to April 3, 2006, during which time he

could not open his mouth to eat solid foods (Pl.'s Br. at 28); (2) failing to relax the restrictive

conditions in the RHU following the April 3, 2006 procedure, which would have enabled him to

receive pain medication, prevented the recurrence of lockjaw, and eliminated the need for additional

medical treatment (Second Am. Compl. ¶¶ 19, 32.d); (3) failing to follow prison doctors' therapy

orders following the April 3, 2006 procedure until July 26, 2006, where such therapy would have

prevented the recurrence of lockjaw and the need for additional medical procedures on June 14,

2006 and July 26, 2006 (Second Am. Compl. ¶¶ 19, 32.d; Bleau Decl. ¶ 12); and (4) providing

Plaintiff with only four soft-food trays between March 13, 2006—the date of Dr. Zarkoski's soft-

food diet order—and April 1, 2006—the date the soft-food diet order expired (Second Am. Compl. ¶ 32.c).[30]

Plaintiff's contentions that Defendants failed to both expedite medical treatment in March 2006 and relax the restrictive conditions in the RHU do not constitute Eighth Amendment violations. No evidence has been proffered establishing that Plaintiff made verbal complaints regarding his lockjaw condition to DiGuglielmo, Dohman, or Lorenzo, and the Court can find nothing in the record indicating that these three Defendants ever personally observed Plaintiff's lockjaw condition. Though DiGuglielmo and Dohman (and possibly Lorenzo) were informed of Plaintiff's condition, at the earliest, on March 29, 2006 and March 30, 2006 respectively, (Defs.' Exs. 59-60; Bleau Dep. 55; Dohman Decl. ¶ 24), they are not doctors and were perfectly "justified in believing that [plaintiff was] in [the] capable hands" of medical professionals. See Spruill, 372 F.3d at 236. Indeed, the record demonstrates that Plaintiff was constantly receiving medical care throughout his lockjaw ordeal. (Defs.' Exs. 48-75; Stanishefski Decl. ¶ 3). Plaintiff received multiple consultations between March 3, 2006 and April 3, 2006. (Defs.' Exs. 52, 54). Plaintiff also received at least eighteen dental visits with a dentist or oral surgeon, including three off-site visits, while Plaintiff was suffering from his lockjaw condition. See Scott v. Vaughn, No. 05-1574,

---

[30] Plaintiff also alleges that, when moved to the infirmary on August 2, 2006, Defendants were deliberately indifferent by placing Plaintiff "for a few days" in a psychiatric observation hard cell. (Bleau Decl. ¶ 14; Pl.'s Br. at 31; Pl.'s Ex. 24-2; Stanishefski Decl. ¶ 5 (noting one-day stay in hard cell)). Notwithstanding Plaintiff's possible failure to exhaust this claim, this claim does not have merit. "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety." Farmer, 511 U.S. at 837. However, the U.S. Constitution "does not mandate comfortable prisons and only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." Wilson v. Sieter, 501 U.S. 294, 298 (2001) (internal citations and quotations omitted); see also Schaeffer v. Schamp, No. 06-1516, 2008 WL 2553474, at *6 (W.D. Pa. June 25, 2008) (holding that plaintiff's "claims that he was placed in a hard cell for ten days without a mattress, soap, toilet paper, running water, legal supplies, his prescription medication and only received one meal a day" were insufficient to constitute an Eighth Amendment violation).

2007 WL 1031380, at *8 (M.D. Pa. Mar. 30, 2007) (holding that no Eighth Amendment liability

existed where, among other things, plaintiff's "own exhibits show that he was being provided with

care by the prison doctors").  Plaintiff's belief that he should have received off-site medical

treatment prior to April 3, 2006, along with his contention that he deserved relaxed conditions while

in the RHU, can only be categorized as mere disagreements with the medical treatment he received,

which are insufficient to establish "deliberate indifference."  See White v. Napoleon, 897 F.2d 103,

110 (3d Cir. 1990) ("[M]ere disagreements over medical judgment do not state Eighth Amendment

claims."); United States ex rel. Walker v. Fayette County, 599 F.2d 573, 575 n.2 (3d Cir. 1979)

("Where a prisoner has received some medical attention and the dispute is over the adequacy of the

treatment, federal courts are generally reluctant to second guess medical judgments and to

constitutionalize claims which sound in state tort law.").

  Moreover, Plaintiff's allegation that an Eighth Amendment violation was created as a result

of DiGuglielmo, Lorenzo, and Dohman's supposed failure to follow post-surgery orders issued on

or around April 3, 2006 is also without merit.  Plaintiff formally complained to Facility Grievance

Coordinator Wendy Moyer that he was not receiving post-surgery therapy in his July 3, 2006

grievance—three months after the April 3, 2006 procedure.  (Defs.' Ex. 68; Pl.'s Ex. 24-1).  Though

the Court cannot find any evidence that Dohman or Lorenzo had any knowledge of Plaintiff's post-

surgery therapy complaint, the record does indicate that DiGuglielmo acquired this knowledge at

some point between July 14, 2006 (the date of Plaintiff's appeal of Stanishefski's denial of

Plaintiff's July 3, 2006 grievance request) and August 2, 2006 (the date DiGuglielmo responded to

the appeal).  (Defs.' Ex. 69; Pl.'s Ex. 24-2).  However, a non-physician prison official cannot be

found "deliberately indifferent simply because [he] fail[s] to respond directly to the medical

complaints of a prisoner who was already being treated by the prison doctor." Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993).  Notwithstanding this legal principle, based on DiGuglielmo's response to Plaintiff's grievance, the record demonstrates that DiGuglielmo reviewed Plaintiff's grievance, attempted to verify Plaintiff's allegations, and referred the complaint to the appropriate prison personnel for resolution (in this case, to Stanishefski).  See Greeno, 414 F.3d at 655-56. Indeed, on August 2, 2006, DiGuglielmo did not reject Plaintiff's appeal outright, but informed Plaintiff that he was remanding the matter back to Stanishefski because Plaintiff's July 13, 2006 follow-up appointment with Dr. Lucyk did not occur.  Further, on August 2, 2006, DiGuglielmo informed Stanishefski that the July 13, 2006 appointment "did not happen" and that Stanishefski should "[s]end an amended response and have [Plaintiff] seen by a dentist."  (Defs.' Ex. 69; Pl.'s Ex. 24-2).  DiGuglielmo's conduct not only indicates his reliance on prison health care administrators, but also demonstrates a conscientiousness towards Plaintiff's concerns that does not constitute an Eighth Amendment violation.  In short, though there may have been a delay in Plaintiff receiving post-surgery therapy, DiGuglielmo and the remaining Defendants cannot be found liable under the Eighth Amendment.

As to Plaintiff's complaint that he only received four soft-food trays, Plaintiff only filed a formal grievance on April 3, 2006, two days after the March 13, 2006 soft-food diet order expired. (Defs.' Ex. 61; Pl.'s Ex. 21-1; Bleau Dep. 57-58).[31]  Again, under Spruill, Defendants can only be liable if they had actual knowledge or some sort of personal involvement in Plaintiff's mistreatment.

---

[31] Plaintiff's claim that he was denied a necessary soft-food diet was dismissed for failure to exhaust administrative remedies in the Court's March 6, 2007 Order (Doc. No. 31).  On May 11, 2007, the Court allowed Plaintiff to file a second amended complaint, adding "only the medical claim related to lockjaw for which he has exhausted his administrative remedies."  (Doc. No. 41).  Broadly construing Plaintiff's soft-food diet claim as being related to his lockjaw condition, the Court will address this claim in the context of the Eighth Amendment.

See Spruill, 372 F.3d at 236; see also Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).

Plaintiff did complain in writing that he was not receiving soft-food trays prior to the order's

expiration to DiGuglielmo and Dohman (and possibly Lorenzo) on March 29, 2006 and March 30,

2006, respectively.  (Defs.' Exs. 59-60).  The Court will therefore infer favorably to Plaintiff that

Defendants acquired knowledge of Plaintiff's concerns on these respective dates.  This notice,

though, was not received until two to three days before the soft-food diet order expired on April 1,

2006.  The passing of two to three days (before plaintiff's complaints became moot upon the soft-

food diet order's expiration) without a response from prison officials does not constitute deliberate

indifference.  See Taylor v. Caldwell, 878 F.2d 1439 (9th Cir. 1989) (unpublished table decision)

(holding that plaintiff's claim of deliberate indifference based on defendant registered nurse's

refusal to call a doctor to get a script for a soft-food diet for plaintiff has no merit because the result

was only a four-day delay in the provision of such a diet).  Indeed, it cannot be said under Spruill

that failing to *immediately* correct the fact that Plaintiff only received four soft-food trays within (at

most) two to three days of acquiring actual knowledge of this deficiency constitutes deliberate

indifference.  While liability may be imposed where prison officials intentionally interfere with or

refuse to provide a prescribed treatment, see White, 897 F.2d at 109-110, Plaintiff has not presented

any evidence of intentional interference nor does this principle prohibit prison officials from taking

the time necessary to conduct an investigation of a prisoner's complaints.  Were there to be liability

in the absence of *immediate action* upon the receipt of a valid medical complaint from a prisoner, a

prison official would not have enough time to review the prisoner's complaint, verify that such

complaints are accurate, and refer a remedial action to a prison medical professional.  See Greeno,

414 F.3d at 655-56; see also Glenn v. Barua, 252 F. App'x 493, 498 (3d Cir. 2007) (holding that the

relative inaction by a prison official to plaintiff's medical complaint did not create a constitutional violation where the prison official responded 16 days after the complaint and the inaction was "properly based on the fact that [the plaintiff] was receiving treatment from prison medical personnel").

Nor is there liability on the part of Defendants for not giving Plaintiff soft-food trays after April 1, 2006. During an April 6, 2006 consultation, Dr. Zarkoski did not order an extension of his then-expired soft-food diet prescription (Defs.' Ex. 56), and any contention on the part of Plaintiff that he needed such a diet represents a mere dispute as to medical services that is insufficient to constitute an Eighth Amendment violation. See Durmer, 991 F.2d at 67 (holding that a doctor's decision not to supply an inmate-patient with the medical services that the patient desires or believes to be proper does not amount to a constitutional violation). The Court will not second-guess the adequacy of the medical decisions made by Plaintiff's physicians. See Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979) ("Courts will disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment which remains a question of sound professional judgment.") (internal quotations omitted).[32]

---

[32] Because Plaintiff's claims do not survive the initial inquiry into whether a constitutional right was violated, the Court need not address whether Defendants are immunized from suit under the doctrine of qualified immunity. (Defs.' Br. 47-49); see Saucier v. Katz, 533 U.S. 194, 201 (2001) (stating that the initial inquiry under the qualified immunity analysis is whether, construing the facts in the light most favorable to the party asserting the injury, the facts alleged show that the defendant's conduct violated a constitutional right), overruled in part by Pearson v. Callahan, 129 S. Ct. 808, 812 (2009) ("We now hold that the Saucier procedure should not be regarded as an inflexible requirement . . . . Our decision does not prevent the lower courts from following the Saucier procedure; it simply recognizes that those courts should have the discretion to decide whether that procedure is worthwhile in particular cases."). Additionally, because no liability exists, the Court will not address Defendants' argument that the Eleventh Amendment bars Plaintiff's federal claims against Defendants in their official capacities. (Defs.' Br. 23-24); see Fields v. Pa. Dep't of Corr., No. 05-5897, 2006 WL 1285030, at *3 n.4 (E.D. Pa. May 5, 2006) ("I need not address the [defendants'] Eleventh Amendment argument. While this argument may be meritorious, it is unnecessary to address it in light of the analyses above."). Nor will the Court address Defendants' claim that Plaintiff is precluded from receiving compensatory damages under 42 U.S.C. § 1997e(e) because he suffered no physical injury. (Defs.' Br. at 46-47). Finally, the Court will not address Defendants' contention that any state law claims asserted by Plaintiff are barred by sovereign immunity as no state law claims appear to be asserted by Plaintiff

Defendants also seek summary judgment on the ground that Plaintiff failed to exhaust his administrative remedies as to his Eighth Amendment oral health and lockjaw claims pursuant to the Prison Litigation Reform Act of 1995 ("PLRA").  (Defs.' Br. at 40-41).  Failure to exhaust is an affirmative defense under the PLRA.  See Jones v. Bock, 549 U.S. 199, 216 (2007) ("We conclude that failure to exhaust is an affirmative defense under the PLRA."); Woodford v. Ngo, 548 U.S. 81, 93 (2006) (stating that exhaustion "attempts to eliminate unwarranted federal-court interference with the administration of prisons, and thus seeks to afford corrections officials time and opportunity to address complaints internally *before allowing the initiation of a federal case*") (emphasis added) (internal quotations and footnotes omitted).  Because Plaintiff's Eighth Amendment claims fail as a matter of law, the Court need not address this affirmative defense.  See Heirs of Estate of Jenkins v. Paramount Pictures Corp., 90 F. Supp. 2d 706, 714 (E.D. Va. 2000) (concluding that, because plaintiff's complaint must be dismissed on summary judgment, "the merits of defendant's affirmative defenses need not be reached"), aff'd, 7 F. App'x 270 (4th Cir. 2001).[33]

---

in his Second Amended Complaint.  (Defs.' Br. at 49-51).  However, to the extent that state law claims are being asserted by Plaintiff, the Court declines to exercise jurisdiction over such claims because the Court grants Defendants' Motion for Summary Judgment as to all of Plaintiff's federal claims.  See Spencer v. Kreisher, No. 08-1820, 2009 WL 111566, at *4 (M.D. Pa. Jan. 15, 2009) (declining to exercise jurisdiction over supplemental state law claims after dismissal of federal claim).

[33] The Third Circuit Court of Appeals concluded in a non-precedential opinion that "there appears to be unanimous circuit court consensus that a prisoner may not fulfill the PLRA's exhaustion requirement by exhausting administrative remedies after the filing of the complaint in federal court."  See Oriakhi v. United States, 165 F. App'x 991, 993 (3d Cir. 2006) (per curiam).  The Court further held that, "[t]o satisfy this [exhaustion] requirement, a prisoner must exhaust all available administrative remedies *prior to filing suit*."  Id. (emphasis added).  Here, Plaintiff completed the grievance procedure regarding his Eighth Amendment claims on November 29, 2006, which was well after the filing of this lawsuit in June 2006.  (Pl.'s Ex. 24-3; Doc. No. 3); see supra note 27.  Plaintiff claims that it took until November 29, 2006 to exhaust his administrative remedies because he "was transferred from Graterford prison to Fayette prison around September 26, 2006."  (Pl.'s Br. at 31-32).  According to Plaintiff, "[t]his final medical grievance appeal decision was delayed by the secretary of inmate grievance until November 29, 2006, while he was at Fayette."  (Id. at 32).  While Oriakhi is persuasive, this exhaustion analysis is complicated by the fact that Plaintiff's Eighth Amendment claims were dismissed on March 6, 2007 for failure to exhaust administrative

An appropriate Order follows.

---

remedies (Doc. No. 31), and then refiled after exhaustion had been completed.  On March 29, 2007—after Plaintiff had exhausted his Eighth Amendment claims—Plaintiff filed a "Motion for Reinstatement of Dismissed Medical Claim" in which he claimed that his initial Complaint "prematurely raised the issue of defendants' indifference to his struggles with lock jaw and other oral health problems while staying in the solitary confinement units."  (Doc. No. 35).  On May 11, 2007, the Court construed Plaintiff's reinstatement request as a Motion to Amend pursuant to Federal Rule of Civil Procedure 15(a) and permitted Plaintiff to amend his Complaint to include only his lockjaw medical claims.  (Doc. No. 41).  The Court noted that "[e]ven if the Court did not permit plaintiff to amend his complaint, he would simply be required to file an additional action, which would inevitably be consolidated with this one."  (Id.).  On June 14, 2007, Plaintiff filed the operative Complaint in this matter with the added Eighth Amendment claims.  (Doc. No. 47).  Regardless, the Court will not render an opinion on exhaustion of administrative remedies given the Eighth Amendment analysis above.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STEVEN BLEAU                            :
                                        :
            Plaintiff                   :      CIVIL ACTION
      v.                                :
                                        :        NO. 06-cv-2405
                                        :
DAVID DIGUGLIELMO, et al.               :
                                        :
            Defendants                  :

---

**ORDER**

AND NOW, this 18th day of March 2009, upon consideration of Plaintiff's *pro se* Cross-Motion for Partial Summary Judgment as to his Due Process claim, Defendants' Response, and all appended exhibits, it is hereby ORDERED that this Motion (Doc. No. 65) is DENIED.

IT IS FURTHER ORDERED that, upon consideration of Defendants' Motion for Summary Judgment, Plaintiff's *pro se* Response, Defendants' Reply Brief, and all appended exhibits, this Motion (Doc. No. 62) is GRANTED.

Accordingly, JUDGMENT IS ENTERED in favor of all Defendants against Plaintiff. The Clerk of Court is directed to CLOSE this case for statistical purposes.

BY THE COURT:


*/s/ Thomas M. Golden*
THOMAS M. GOLDEN, J.